IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 1:25-cv-04066-RBJ

RUBEN UGARTE HERNANDEZ,

        Petitioner,

v.

JUAN BALTAZAR, ROBERT HAGAN,
KRISTI NOEM, TODD LYONS,
PAM BONDI,
in their official capacities,

        Respondents.

---

## ORDER

Before the Court is petitioner-plaintiff Ruben Ugarte Hernandez's (petitioner or Mr. Ugarte Hernandez) Verified Petition for a Writ of Habeas Corpus (Petition) and Motion for a Temporary Restraining Order (Motion).  ECF No. 1; ECF No. 15.[1] Petitioner seeks an order granting his immediate release, or, in the alternative, release on a bond of $1,500.[2]  ECF No. 1 at 20; ECF No. 5 at 15.  Respondent-

---

[1] This Court previously granted Mr. Ugarte Hernandez's Motion to the extent that it prohibited respondents from transferring him away from the District of Colorado or removing him from the United States until the termination of this case.  ECF No. 10.

[2] If the Court denies these remedies, Mr. Ugarte Hernandez requests that the Court order that he be provided a bond hearing before a neutral adjudicator within seven days.  ECF No. 5 at 15.

defendants (respondents) filed a consolidated response, opposing the requested relief in its entirety. ECF No. 14. Petitioner replied in support of his Petition and Motion. ECF No. 15. After review, for the reasons stated herein, the Petition for a writ of habeas corpus is GRANTED.[3] Respondents SHALL release Mr. Ugarte Hernandez upon payment of a $1,500 bond and SHALL file a status report with this Court within five (5) days of this Order.

## BACKGROUND

This case presents the same question of statutory interpretation that this Court has ruled on several times: whether the detention of a noncitizen who entered the United States without inspection and has lived here for many years is governed by 8 U.S.C. § 1225(b)(2)(A) or by 8 U.S.C. § 1226(a).

Petitioner, a Mexican national who entered the United States without inspection and has lived here for over 30 years, claims that respondents are unlawfully detaining him without bond under § 1225(b)(2)(A) of the Immigration and Nationality Act (INA).[4] ECF No. 1 at ¶ 1. This section requires the detention during removal proceedings of a noncitizen "who is an applicant for admission" to the United States if "the examining immigration officer determines that [the

---

[3] Because the relief requested in the Motion is coextensive with the relief sought in—and granted under—Mr. Ugarte Hernandez's Petition, the Motion is respectfully denied as moot. *See Caballero Loa v. Baltazar*, 25-cv-03120-NYW, 2025 WL 2977650, at *9 (D. Colo. Oct. 22, 2025).

[4] For this Order, the Court accepts the facts in Mr. Ugarte Hernandez's Petition as true.

noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted[.]" § 1225(b)(2)(A). Respondents maintain that this provision governs petitioner's detention. Petitioner argues that his detention is governed by § 1226(a), which entitles noncitizens to a bond hearing before an Immigration Judge (IJ).

On November 24, 2025, an IJ determined that they did not have jurisdiction to grant petitioner's request for bond, but that if they did, they would order petitioner's release upon payment of a $1,500 bond. ECF No. 1 at ¶ 2.

## ANALYSIS

A district court may grant a writ of habeas corpus to any person who demonstrates that he is "in custody in violation of the Constitution or laws of the United States." 28 U.S.C. § 2241. The individual in custody bears the burden of proving that his detention is unlawful. *Walker v. Johnston*, 312 U.S. 275, 286 (1941). Where, as here, the briefing demonstrates that the petitioner's challenge is fundamentally legal in nature, the court need not hold an evidentiary hearing to resolve it. *See* 28 U.S.C. § 2243.

Although the Court has confronted this question before, *see, e.g.*, *Cervantes Arredondo v. Baltazar, et al.*, 25-cv-03040-RBJ (D. Colo. Oct. 31, 2025) (ECF No. 21); *Velazquez de Leon v. Baltazar, et al.*, 25-cv-03805-RBJ (D. Colo. Dec. 12, 2025) (ECF No. 19), as this issue continues to recur, the Court sets forth its analysis here from first principles and addresses respondents' counterarguments. Unless and

until there are developments in the law, the analysis below should be expected to govern like cases before this Court going forward.

As this Court has previously noted, the overwhelming majority of federal district courts to confront this question, including every court in this District, have found that noncitizens like petitioner are entitled to a bond hearing during removal proceedings. *See Velazquez de Leon*, 25-cv-03805-RBJ*, ECF No. 19, at *4-5, n. 4; *see also* ECF No. 5 at 3 (collecting cases). The Court is also aware, however, of a growing body of district court decisions reaching the opposite conclusion and holding that noncitizens like petitioner are subject to mandatory detention. *See, e.g.*, *Altamirano Ramos v. Lyons*, --F.Supp.3d---, 2025 WL 3199872 (C.D. Cal. Nov. 12, 2025); *Mejia Olalde v. Noem*, 1:25-cv-168, 2025 WL 3131942 (E.D. Mo. Nov. 10, 2024); *Sandoval v. Acuna*, 6:25-cv-01467, 2025 WL 3048926 (W.D. La. Oct. 31, 2025). Having carefully considered these decisions and others, along with respondents' arguments, the Court remains unpersuaded.

For the reasons that follow, the Court again concludes that § 1226—and not § 1225(b)(2)—controls detention during removal proceedings for noncitizens who entered the United States without inspection more than two years earlier.

## I.    The Plain Language of § 1225(b)(2)(A)

"As with all statutory interpretation cases, [the Court] begin[s] with the language of the statute." *U.S. v. Burkholder*, 816 F.3d 607, 614 (10th Cir. 2016)

(internal citation omitted).  Section § 1225(b)(2)(A) states that, subject to statutory exceptions, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under 1229a (full removal proceedings) of this title."

A plain reading of the text reflects that this section applies to a noncitizen who meets three requirements: he is (1) an "applicant for admission," (2) "seeking admission," and (3) upon examination by an immigration officer, determined to be "not clearly and beyond a doubt entitled" to admission.  *Salcedo Aceros v. Kaiser*, No. 25-cv-06924-EMC, 2025 WL 2637503, at *9.  The latter two requirements qualify the first one; in other words, § 1225(b)(2)(A) applies to a subset of noncitizens within the broader category of applicants for admission.  *Id.* at *10.

Petitioner meets, at most, one of these criteria.  While "an applicant for admission" includes an "alien present in the United States who has not been admitted or who arrives in the United States," 8 U.S.C. § 1225(a)(1), it does not follow that every such individual is "seeking admission."  Congress' use of the phrase "seeking admission," which is not statutorily defined, "necessarily implies some sort of present-tense action."[5]  *Martinez v. Hyde*, 792 F.Supp.3d 211, 218 (D. Mass. 2025).

---

[5] *But see Bautista v. Santacruz*, 5:25-cv-01873-SSS-BFM, ---F.Supp.3d----, 2025 WL 3713987, at *7-12 (C.D. Cal. Dec. 18, 2025) (concluding, based on a statutory analysis of § 1225 and the INA's definition section, 8 U.S.C. § 1101(a)-(h), that individuals "who are present in the United States

A noncitizen who entered without inspection and remains in the United States for many years thereafter is not "seeking admission" where those words are given their "plain, ordinary meaning."[6]  *See Lopez Benitez v. Francis*, 795 F.Supp.3d 475, 489 (S.D.N.Y. 2025).

This distinction between an "applicant for admission," a legal status, and "seeking admission," an action or set of actions, is underscored by the regulations implementing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), of which § 1225 and § 1226 are a part.  *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394 (2024) (an agency's implementing regulations issued close in time to the statute's passage provide a useful reference point for understanding the statutory scheme).[7]  Relevantly here, the regulations state that an "arriving alien who appears to the inspecting officer to be inadmissible" shall be

---

and have not been inspected and authorized by an immigration officers are merely part of the broadly defined term 'noncitizen': 'any person not a citizen or national of the United States,'" as opposed to "applicants for admission" under § 1225(a)(1).  However, under either analysis, the result is the same. Whether petitioner is properly classified as an "applicant for admission" or instead, falls under the more general term "noncitizen," he is outside the scope of § 1225(b)(2)(A)'s scope because he is not "seeking admission."

[6] The court in *Lopez Benitez* helpfully analogized to an individual who enters a movie theater without purchasing a ticket and then proceeds to watch the first few minutes of the movie.  795 F.Supp.3d at 489.  If that person was later detected by a movie theater employee and tried to buy a ticket, "one would not ordinarily describe them as 'seeking admission' (or 'seeking' 'lawful entry') at that point—one would say that they had entered unlawfully but now seek a lawful means of remaining there." *Id.*

[7] The relevant regulations implementing IIRIRA were promulgated by the Department of Justice mere months after its passage and have not changed.  *See Guerrero Orellana v. Moniz*, 25-cv-12664-PBS, ---F.Supp.3d----, 2025 WL 2809996, at *8 (D. Mass. Oct. 3, 2025).

detained during removal proceedings pursuant to § 1225(b).  8 C.F.R. § 235.3(c). An "arriving alien" is, in turn, defined as "an applicant for admission coming or attempting to come into the United States…" 8 C.F.R. § 1.2.  Therefore, under the regulations, "'an arriving alien' is an 'applicant' who is also *doing* something: 'coming or attempting to come into the United States.'" *Lopez Benitez*, 795 F.Supp.3d at 489 (emphasis in original).  In this way, the regulations mirror the statute: § 1225(b)(2)(A) applies to applicants for admission who are "seeking admission," a group "roughly interchangeable" with "arriving aliens." *See id.* Petitioner is not part of this group.

Nor does petitioner satisfy the statute's examination requirement. "Examination" is "not an unbounded concept" triggered by any encounter with immigration authorities but instead refers to "the specific legal process one undergoes while trying to enter the country," and generally occurs in person at a port-of-entry. *Romero v. Hyde*, 794 F.Supp.3d 271, 283 (D. Mass. 2025) (citing to C.F.R. § 235.1(a)).  This requirement further confirms that § 1225(b)(2)(A) pertains to noncitizens attempting to enter the country, not those who remain inside the country long after an unlawful entry.

Respondents' argument collapses the three requirements of § 1225(b)(2)(A) into one, violating "one of the cardinal rules of statutory construction": the canon against surplusage. *Castañon-Nava v. U.S. Dept. of Homeland Sec.*, 161 F.4th 1048,

1061 (7th Cir. 2025). Under this canon, "every clause and word of a statute should have meaning," and "if an interpretation of one provision would render another provision superfluous, courts presume that interpretation is incorrect." *Id.* (internal citations omitted). If every applicant for admission is necessarily "seeking admission," no matter how long they have been present in the country, then the latter phrase could be struck from the statute without changing its meaning. Likewise, respondents' interpretation reads out the "examination" requirement entirely or else ignores the specific meaning of that term. This Court declines to read the text in a manner that would render these statutory conditions "superfluous, void, or insignificant." *Lopez Benitez*, 795 F.Supp.3d at 488 (internal citation omitted).

As the Seventh Circuit observed in *Castañon-Nava*, the only appellate authority on this question to date, Congress could easily have defined "applicant for admission" to include those "seeking admission," "but elected not to do so." 161 F.4th at 1061. That choice must be respected.

Respondents nevertheless insist that all "applicants for admission" are deemed to be "seeking admission," and invoke another statutory provision, § 1225(a)(3), in support of that position. ECF No. 14 at 6-7. That provision states, in part, that "[a]ll aliens … who are applicants for admission *or otherwise seeking admission* … shall be inspected by immigration officers." § 1225(a)(3) (emphasis added). According to respondents, the phrase "or otherwise" demonstrates that "applicants for

admission" are a subset of those noncitizens "seeking admission," rather than a distinct but at times overlapping category. ECF No. 14 at 7 (citing *Rojas v. Olson*, 25-cv-1437-bhl, 2025 WL 3033967, at *8 (E.D. Wis. Oct. 30, 2025)). In their view, this language confirms that it is impossible to be an applicant for admission without also—and at all times—seeking admission.

This argument fails. Section 1225(a)(3) governs "inspection"—the process by which an immigration officer examines a noncitizen attempting to enter the country in order to determine admissibility. *See* 8 C.F.R. § 235.1(a). The full provision reads: "All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission *or readmission to or transit through the United States* shall be inspected by immigration officers." § 1225(a)(3) (emphasis added). Those latter categories—noncitizens seeking readmission to or transit through the country—tie the section as a whole to the point of attempted entry, whether a noncitizen is arriving for the first time, returning, or simply passing through our borders. After all, a noncitizen cannot generally seek readmission to or transit through the United States if they are already present. Read in that context, the phrase "or otherwise" refers to noncitizens seeking admission other than "applicants for admission"; it does not establish that all "applicants for admission" are necessarily "seeking admission."

Section 1225(a)(3) therefore provides no support for respondents' attempt to extend § 1225(b)(2)(A) beyond its textually limited reach.

## II.    The Distinct Functions of § 1225 and § 1226 in the Statutory Scheme

While the plain language of § 1225(b)(2)(A) amply demonstrates that the provision does not apply to petitioner, its place within the larger statutory scheme removes any doubt. *See Guerrero Orellana*, 2025 WL 2909996, at *5 ("The words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (internal citation omitted).

This analysis starts with the statutory titles of § 1225 and its neighboring provision, § 1226. *See, e.g.*, *Lopez-Campos v. Raycraft*, 797 F.Supp.3d 771, 780 (E.D. Mich. 2025) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of statute.") (internal citations omitted). The title of § 1225—"Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing"—signals that the section is principally concerned with the processing of noncitizens "who have arrived at an official port of entry or who have been apprehended trying to enter the country at an unauthorized location." *Jennings v. Rodriguez*, 583 U.S. 281, 285 (2018) (cleaned up). Reading the section as a whole confirms that understanding.

Section 1225 describes, for instance, who must be inspected upon arrival, § 1225(a)(1)-(3), which noncitizens must be funneled into expedited removal

10

proceedings upon that inspection, and the processes for screening and referring asylum claims from those who would otherwise be subject to expedited removal, § 1225(b)(1).  It also authorizes immigration officers to "board and search any vessel, aircraft, railway car, or other conveyance or vehicle … being brought into the United States," and to order the detention and production of any noncitizens on board.  § 1225(d).  Taken together, these provisions reflect a statute directed at immigration enforcement at the border and other points of entry.

Section 1226, entitled "Apprehension and detention of aliens," addresses the identification, arrest, detention, and monitoring of noncitizens pending the outcome of their removal proceedings.  *See* §§ 1226(a)-(d).  This section only makes sense if applied to people already present in the United States.  For instance, § 1226(d)(1) directs the Attorney General to "devise and implement a system" to assist federal, state, and local law enforcement in determining whether individuals in their custody—and thus necessarily inside the United States—are noncitizens subject to mandatory removal.  Nothing in the title of this section or its text limits its reach to noncitizens who have been lawfully admitted; indeed, as discussed below, the statute expressly contemplates its application to those who have not.

Read together, §§ 1225 and 1226 establish a broad dichotomy: noncitizens at or near a point of entry, or who have been present only briefly, are generally subject to mandatory detention, while those who have been present longer are generally

eligible for release. This dichotomy "fits within the broader context of our immigration law," which has "long made a distinction between those aliens who have come to our shores seeking admission … and those who are within the United States after an entry, irrespective of its legality." *Castañon-Nava*, 161 F.4th at 1061-62; *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (recognizing legal "distinction between an alien who has effected an entry into the United States and one who has never entered"). Providing bond hearings for people like petitioner—while denying them to those presenting themselves for admission at a port-of-entry—is entirely consistent with that longstanding tradition. Respondents protest that this detention scheme entrenches inequity and creates a perverse incentive for persons to enter the country uninspected. ECF No. 14 at 9-10. But whether such a regime is desirable as a policy matter is a separate question. Absent a legislative amendment, this Court may not disregard the text and structure of these sections to impute a different intent to Congress.

This statutory analysis also rests upon the Supreme Court's discussion of the INA's detention regime in *Jennings*. There, the Supreme Court explained that "U.S. immigration law authorizes the Government to detain certain aliens *seeking admission into the country* under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c)." 583 U.S. at 289 (emphases added).

The critical distinction, in other words, is not whether a noncitizen qualifies as an "applicant for admission" under § 1225(a)(1), but whether the noncitizen is seeking lawful entry or is already present in the United States. Because petitioner has long been present in this country, his detention falls under § 1226.

In arguing that *Jennings* instead supports their position, respondents' rely on the Supreme Court's description of § 1225(b)(2) as "a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)." ECF No. 14 at 4 (citing *Jennings*, 583 U.S. at 287). Because petitioner is an "applicant for admission," they argue, his detention is necessarily governed by §1225(b)(2)'s mandatory regime.

Respondents' reading of *Jennings*, however, is selective. At the beginning of the section from which respondents draw the quoted language, the Supreme Court grounded its discussion of § 1225 within the process that "generally begins at the Nation's borders and ports of entry, where the Government must determine whether an alien seeking to enter the country is admissible." *Jennings*, 583 U.S. at 287. The Court then contrasted that framework with the detention of noncitizens who are already present, stating that: "[e]ven once *inside* the United States, aliens do not have an absolute right to remain" and "may still be removed if he or she falls within one or more classes of deportable aliens," including "aliens who were *inadmissible at the time of entry* or who have been convicted of certain criminal offenses since admission." *Id.* at 288 (emphases added and internal citations omitted). "Section

1226," the Court explained, "generally governs *that* group of aliens pending their removal." *Id.* (emphasis added).

In this broader context, respondents' focus on the "catchall" language is misplaced. If, as respondents claim, § 1226 only pertains to noncitizens rendered deportable after a lawful admission, the Court would have said "even once admitted to the United States, aliens do not have an absolute right to remain," not "once inside the United States" ECF No. 14 at 5. Likewise, respondents' position is fatally contradicted by the Court's inclusion of "aliens who were inadmissible at the time of entry," alongside those convicted of crimes after admission, in the "group" covered by § 1226. In the respondents' view, only noncitizens who were lawfully admitted should be included, but *Jennings* clearly contemplates that § 1226 applies to those who remain in the country after effecting an unlawful entry as well.

Respondents' position also runs headlong once again into the canon against surplusage, but this time, on a much larger scale. In this instance, adopting respondents' view would require reading out several whole subsections of the same statutory scheme, which is when "the canon against surplusage is strongest." *Martinez*, 792 F.Supp.3d at 221 (internal quotations marks and citation omitted). Specifically, §§ 1226(c)(1)(A), (D) and (E) prohibit the release of certain inadmissible noncitizens—that is, individuals who are present in the United States without having been admitted (and thus, under § 1225(a)(1), are "applicants for

14

admission"). As numerous courts have recognized, these provisions—which include the Laken Riley Act amendments passed just last year—would be nullified if all inadmissible noncitizens are already ineligible for bond under § 1225(b)(2)(A). *See, e.g.*, *Martinez*, 792 F.Supp.3d at 221, *Guerrero Orellana*, 2025 WL 2809996, at *7-8; *Lopez Benitez*, 795 F.Supp.3d at 490. Moreover, "[w]here Congress has created specific exceptions to a rule, it proves the general applicability of that rule, absent those exceptions." *See Romero*, 794 F.Supp.3d at 287 (internal quotation marks and citation omitted). In this case, the exceptions enumerated under § 1226(c) confirm that discretionary release under § 1226(a) is the default rule for individuals who entered the country without inspection.

Respondents assure the Court that "[r]edunancies are common in statutory drafting," but provide no sound basis to accept that explanation here. ECF No. 14 at 9 (internal quotation marks and citation omitted). Absent an exceptionally compelling reason to depart from the fundamental rules of statutory construction, the Court cannot "construe § 1225(b)(2)(A) and § 1226, two components of a single statutory scheme, in a manner that would render language in the latter section to be meaningless." *Guerreo Orellana*, 2025 WL 2809996, at *8.

Finally, if § 1226 governs petitioner's detention, to whom, then, does § 1225(b)(2)(A) apply? Respondents suggest that the Court's interpretation would make § 1225(b)(2)(A) superfluous: individuals who are "arriving aliens" or have

15

been unlawfully present in the United States for less than two years are subject to expedited removal under § 1225(b)(1), while all other noncitizens in removal proceedings would fall under § 1226. ECF No. 14 at 4, 9. But § 1225(b)(2)(A) is not "an empty set" under the Court's reading. *Salcedo Aceros*, 2025 WL 2637503, at *11. Not all arriving noncitizens are funneled into expedited removal; only those that are inadmissible on the specific grounds set out in 8 U.S.C. §§ 1182(a)(6)(C) and (a)(7) (misrepresentation, fraud, or inadequate documentation). § 1225(b)(1)(A)(i). The INA contains many other statutory grounds of inadmissibility. *See* 8 U.S.C. § 1182(a)(1)-(10). Therefore, § 1225(b)(2)(A) applies "most obviously" to arriving noncitizens who are inadmissible on grounds other than those triggering expedited removal under § 1225(b)(1)(A)(i).[8] *Salcedo Aceros*, 2025 WL 2637503, at *11.

Accordingly, the Court's reading gives effect to § 1225(b)(2)(A) without collapsing it into § 1226 or rendering either provision superfluous, preserving the dichotomy established by Congress.

### III.    Legislative History and Past Agency Practice

While the application of § 1226 to petitioner's detention is clear enough from the "the text and structure" of the INA, the Court also finds that both legislative

---

[8] To give one such example, a returning noncitizen who attempted to gain admission to the United States after overstaying their visa would likely fall under § 1225(b)(2)(A). *See* 8 U.S.C. § 1182(a)(9)(B).

history and longstanding agency interpretation bolster this conclusion. *Castañon-Nava*, 161 F.4th at 1061.

Respondents argue that legislative history supports their position. *See* ECF No. 14 at 9-10. It is true that, in enacting IRRIRA, Congress sought to address an anomaly in the INA that afforded "greater procedural and substantive rights" to noncitizens who entered without inspection than to those who presented themselves to immigration officers at a designated port-of-entry. *See id.* at 10 (citing *Hing Sum v. Holder*, 602 F.3d 1092, 1100 (9th Cir. 2010)). Congress did so by replacing "deportation" proceedings (for noncitizens who had entered the country) and "exclusion" proceedings (which were "more summary" and applied to those at ports-of-entry) with a unified system of "removal" proceedings applicable to most noncitizens, except those subject to expedited removal. *See Hing Sum*, 602 F.3d at 1100.

It does not follow, however, that Congress intended to "fully disrupt the old system, including the system of detention and release." *Salcedo Aceros v. Kaiser*, 2025 WL 2637503, at *12. To the contrary, the legislative record reflects that Congress intended to maintain the pre-IRRIRA framework of discretionary release for noncitizens apprehended inside the United States. *See* H.R. REP. 104-469, pt. 1, at 229 ("Section 236(a) [1226(a)] restates the current provisions in section 242(a)(1)

17

regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States").

At the same time that Congress left the scope of § 1226(a)'s predecessor statute intact, it expanded the number of crime-based exceptions to discretionary release by enacting § 1226(c) and afforded the government two years to expand detention capacity by approximately 9,000 beds. *See* ECF No. 15 at 8 (citing H.R. Rep. 123-24; M.H. Taylor, *The 1996 Immigration Act: Detention and Related Issues*, 74 INTERREL 209, 216-17 (1997)). This measured expansion underscores that Congress anticipated only a relatively modest increase in the population subject to mandatory detention—not the wholesale transformation that respondents now urge. Certainly, had Congress believed that all individuals who entered the country without inspection—a population no one disputes is in the millions—would fall under § 1225(b)(2)(A)'s mandatory detention regime, it would have said so explicitly, required a far greater expansion of detention capacity, and likely provided more time to so. The absence of any legislative history reflecting a change on this scale speaks volumes. "Congress … does not alter fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whiteman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001).

Up until recently, the government also recognized that § 1226 rather than § 1225(b)(2)(A) governed the detention of noncitizens like petitioner.  Although not controlling, "the longstanding practice of the government—like any other interpretive aid—can inform [a court's] determination of what the law is," particularly where the executive branch's interpretation "was issued roughly contemporaneously with enactment of the statute and [has] remained consistent over time."  *Loper Bright*, 603 U.S. at 386 (citation modified).  Both considerations are present here.

Shortly after IRRIRA's passage, then-Attorney General Janet Reno proposed a rule that would have rendered all "[i]nadmissible [noncitizens] in removal proceedings" ineligible for bond, the very interpretation respondents press now.  ECF No. 15 at 9 (citing *Inspection and Expedited Removal of Aliens: Detention and Removal of Aliens; Conduct of Removal*, 62 Fed. Reg. 444, 483 (Jan. 3, 1997)).  However, this proposal was expressly rejected in the final rules.  Instead, the final rules provided that only "[a]rriving noncitizens" would be excluded from bond.  62 Fed. Reg. 10312, 10361 (Mar. 6, 1997).  The Attorney General explained this change unambiguously in the Federal Register: "Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond

redetermination." *Id*. at 10321; *see also* 63 Fed. Reg. 27441, 27448 (May 19, 1998) (codifying detention rules at § 3.19(h)(2)(i)).

This rule has remained in place ever since. Notwithstanding respondents' current position, the Department of Homeland Security's regulations continue to provide that bond is available during removal proceedings for inadmissible noncitizens present inside the country, but not for arriving aliens. 8 C.F.R. § 10013.19(h)(2). And until an abrupt change last year, the government consistently treated § 1226(a) as the governing detention statute for people like petitioner. *See e.g.*, *Martinez*, 792 F.Supp.3d at 217-18.

Accordingly, the Court finds that the legislative history and nearly three decades of consistent agency practice cuts in favor of the interpretation that is already compelled by the text and structure of the INA.

## IV.   Remedy

For the reasons stated above, Mr. Ugarte Hernandez's detention is properly governed by § 1226(a), his current mandatory detention under § 1225(b)(2)(A) violates his statutory rights, and he is therefore entitled to habeas relief.[9]

---

[9] Because the Court grants release on this basis, it need not decide whether petitioner is entitled to relief as a member of the nationwide "Bond Eligible Class" certified by a district court in the Central District of California in *Bautista*, 2025 WL 3713987. *See* ECF No. 1 at ¶¶ 61-66; ECF No. 14 at *13- 15; ECF No. 15 at *8-9. In *Bautista*, the court declared the Department of Homeland Security policy purporting to mandate detention under § 1225(b)(2)(A) for noncitizens like petitioner "unlawful" and vacated or "set aside" that policy under the Administrative Procedure Act, thereby affording affected class members their statutory right to a bond hearing. 2025 WL 3713987, at *29. That decision is currently on appeal before the Ninth Circuit. *See Bautista v.*

The federal habeas corpus statute "does not limit the relief that may be granted to discharge of the applicant from physical custody." *Carafas v. LaVallee*, 391 U.S. 234, 238 (1986). "Its mandate is broad with respect to the relief that may be granted." *Id.* "It provides that '[t]he court shall ... dispose of the matter as law and justice require.'" *Id.* (quoting 28 U.S.C. § 2243).

Ordinarily, the Court would order that respondents bring Mr. Ugarte Hernandez before an IJ for a bond hearing. *See Nava Hernandez v. Baltazar*, 1:25-cv-03094-CNS, 2025 WL 2996643, at *8 (D. Colo. Oct. 24, 2025) ("Section 1226(a) does not require release—it provides DHS the discretion to grant a [noncitizen] release on bond"); *see also Cervantes Arredondo*, 25-cv-03040-RBJ, ECF No. 21, at *8 (ordering a bond hearing); *Velazquez de Leon*, 25-cv-03805-RBJ, ECF No. 19, at *8 (same).

However, because an IJ has already determined that Mr. Ugarte Hernandez's release is not a risk to the community and that his appearance for removal proceedings may be secured by a bond of $1,500, "different relief is warranted here." *Valera v. Baltazar*, 1:25-cv-03744-CNS, 2025 WL 3496174, at *3 (D. Colo. Dec. 5, 2025). Ordering a bond hearing would serve no purpose. Therefore, the Court finds that release upon payment of $1,500 (and no additional conditions) is the appropriate

---

*U.S. Dept. of Homeland Sec.*, No. 25-7958 (9th Cir. Dec. 19, 2025). Although the pendency of that appeal does not preclude this Court from giving that decision effect, the Court rests its decision solely on its independent conclusion that petitioner's detention violates his statutory rights.

relief in these circumstances. *See Garcia-Arauz v. Noem*, 2:25-cv-02117-RFB-EJY, ---F.Supp.3d----, 2025 WL 3470902, at *9 (D. Nev. Dec. 3, 2025) (ordering release on conditions previously set by an IJ); *Escobar Salgado v. Mattos*, 2:25-cv-01872-RFB-EJY, ---F.Supp.3d----, 2025 WL 3205356 (D. Nev. Nov. 17, 2025) (same).

## **ORDER**

It is hereby ORDERED that:

Petitioner's Petition for a Writ of Habeas Corpus, ECF No. 1, is GRANTED.

Petitioner's Motion for a Temporary Restraining Order, ECF No. 5, is respectfully DENIED as moot, except to the extent that the Court's previous ORDER enjoining respondents from transferring Petitioner outside the District of Colorado or removing him from the United States during the pendency of these proceedings, ECF No. 10, is converted to a preliminary injunction.[10]

Respondents SHALL immediately release petitioner upon payment of a $1,500 bond.

The parties SHALL file a joint status within five (5) days of this Order updated the Court on petitioner's custody status.

Dated: January 15, 2026        BY THE COURT:

---

[10] To the extent petitioner seeks attorneys' fees, *see* ECF No. 1 at 19, he is directed to file a separate motion complying with the Federal Rules of Civil Procedure and the Local Rules.

_____
R. Brooke Jackson
Senior United States District Court Judge